UNITED STATES  DISTRICT COURT

Northern District of California

DENISE GALLO,                                      No. C 07-01561 MEJ

                    Plaintiff(s),          **ORDER DENYING PLAINTIFF'S**
        v.                                 **MOTION FOR SUMMARY**
                                           **JUDGMENT**
THE COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,                   **ORDER GRANTING DEFENDANT'S**
                                           **CROSS-MOTION FOR SUMMARY**
                    Defendant(s).          **JUDGMENT**
_____/

## I.  INTRODUCTION

Plaintiff Denise Gallo ("Plaintiff") brings this action pursuant to 42 U.S.C § 405(g), seeking judicial review of the decision of the Commissioner of Social Security ("Defendant"), denying her claim for supplemental security income ("SSI") and disability insurance benefits ("DIB") under Titles II and XVI of the Social Security Act.  Pending before the Court are the parties' cross-motions for summary judgment.  (Dkt. ## 21, 28.)  Having read and considered the parties' papers, the administrative record below, and the relevant legal authority, the Court hereby DENIES Plaintiff's motion for summary judgment and GRANTS Defendant's cross-motion for summary judgment for the reasons set forth below.

## II.  BACKGROUND

### A.      Education and Work Experience

Plaintiff was born on May 31, 1963.  (Administrative Record ("AR") 266.)  She completed high school, and then received a license in cosmetology in 1989.  (AR 35.)  From 1989 until 2005, she worked as a cosmetologist.[1]  (AR 39-40.)  At the time she filed for disability in January 2005,

_____

[1]Plaintiff took "a couple of years off" during this time.  (AR 39.)  When she returned to work, she worked about thirty-two hours a week.  (AR 39-40.)

UNITED STATES DISTRICT COURT
For the Northern District of California

1  Plaintiff was not working.  (AR 40.)  Plaintiff testified that she quit her most recent cosmetology job,

2  though she did not specify when, because working in a small space "bother[ed] [her] neck a lot."

3  (AR 40.)  In addition, Plaintiff completed 12 hours of college credits during the 2004-2005 school

4  year with a 4.0 GPA.  (AR 59.)  She also planned to enroll in six units in the Fall of 2006.  (AR 61.)

5  **B.    Medical History**

6       Plaintiff's disability application stems from an industry-related accident on July 13, 1993, in

7  which she lifted and balanced a heavy sign on her head when moving it from the sidewalk to inside

8  the store at which she worked.  (AR 422.)  Immediately following the accident, Jerry W. Dippé,

9  D.C., treated Plaintiff three times a week, from July 13 through July 30, 1993.  (AR 422-23.)  Dr.

10  Dippé diagnosed that Plaintiff suffered point tenderness and reduced range of motion in the cervical

11  spine, as well as muscle spasms.  (AR 422.)  He determined that Plaintiff was temporarily disabled,

12  but could return to regular work by July 28, 1993.  (AR 423.)

13       On March 16, 1994, Bill J. Uriarte, D.C., examined Plaintiff.  (AR 424-25.)  Dr. Uriarte

14  noted that Plaintiff telephoned on an emergency basis that morning, complaining of a re-

15  exacerbation of neck pain symptoms.  (AR 424.)  He recommended one to three visits within that

16  week to alleviate symptoms, followed by treatment on an as-needed basis only.  (AR 424.)  Dr.

17  Uriarte noted that Plaintiff could return to work the next day.  (AR 424.)

18       On August 4, 1999,[2] Plaintiff underwent an x-ray at Kaiser Permanente due to neck pain.

19  (AR 427.)  However, the Court was unable to locate any documentation in the record that provides

20  or discusses the results of this x-ray.  (AR 427.)

21       On January 2, 2001, V. Kumra, M.D., examined Plaintiff based on her complaints of lower

22  back and shoulder pain, and a migraine.  (AR 177.)  Dr. Kumra diagnosed Plaintiff with myofascial

23  pain, which was "waxing and waning," but "always there" daily for more than three years.  (AR

24  

25       [2]There is no record of medical treatment from 1994 until 1999 in the administrative record,
26  with the exception of vaccinations Plaintiff received for flu, tetanus, and diphtheria: 11/12/1994,
    5/31/1995, 10/04/1997, 10/15/1998, 10/11/1999, 12/22/2000, 12/01/2001, and 11/07/2002.  (AR
27  182.)

28  

UNITED STATES DISTRICT COURT
For the Northern District of California

1    177.) Dr. Kumra indicated that Plaintiff was taking the following medications: Triamenale

2    (illegible), Serzone 500mg, Amitriptyline 30mg, Prn Cyclobenzaprine 10mg, and Ibuprofen. (AR

3    177.)

4          On January 11, 2001, Dr. Kumra injected Plaintiff with Bupivacaine in three "trigger spots"

5    to treat Plaintiff for fibromyalgia syndrome. (AR 176.) Dr. Kumra injected Plaintiff in her neck,

6    left and right upper back without complication. (AR 176.) Dr. Kumra also noted that Plaintiff was

7    taking Ibuprofen. (AR 176.)

8          On June 30, 2001, Lucy J. Oh, M.D., examined Plaintiff for her complaints of fibromyalgia

9    and left shoulder pain. (AR 175.) Dr. Oh administered a trigger point injection ("TPI") in Plaintiff's

10   left shoulder. (AR 175.)

11          On July 25, 2001, K.M. Vickery, M.D., completed a Radiology Report regarding Plaintiff's

12   cervical spine. (AR 181, 428.) Dr. Vickery noted "mild disc narrowing at C5-6 with osteophytes

13   consistent with degenerative disc disease." (AR 428.)

14          On July 26, 2001, T. Toth, M.D., completed an x-ray due to Plaintiff's complaints of neck

15   spasms and fibromyalgia. (AR 173.) However, Dr. Toth's notes are illegible and the Court was

16   unable to locate any documentation in the record that provides or discusses the results of this x-ray.

17          On November 19, 2001, Charles Evans, M.D., examined Plaintiff for neck, shoulder, arm,

18   and occasional lower back pain. (AR 169-71.) In the Outpatient Pain Management Consultation

19   form, Dr. Evans noted that Plaintiff's "neck pain is under good control with very little of the usual

20   stiffness and soreness." (AR 170.) Based on his physical examination of Plaintiff, Dr. Evans found

21   that she had a "flattened affect" and "appeared tearful several times." (AR 170.) A review of her

22   cervical spin showed "a normal range of motion" and "very minimal tenderness" at the

23   cervicothoracic junction, with "mild tenderness in the muscles paraspinously of the neck" and "no

24   tenderness laterally or anteriorly." (AR 170.) Although Dr. Evans found "fairly marked tenderness

25   in the trapezii bilaterally and in the teres," he noted that there were "no frank trigger points" or

26   spasms when Plaintiff was relaxed. (AR 170.) Dr. Evans also noted that Plaintiff's cervical spines's

27   "range of motion is normal." (AR 170.)

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Dr. Evans found that Plaintiff's back and thoracic spin had "very minimal tenderness," her

2    upper and lower extremities were "nontender," and her left and right medial knee were "absent,"

3    with a normal range of motion of the lumbar spine, despite "mild lumbosacral discomfort in forward

4    flexion." (AR 170.) His review of Plaintiff's cervical spine x-rays revealed "very mild degenerative

5    disk disease at C5-6," with "small osteophytes" and "no encroachment in the foramen." (AR 170.)

6    Dr. Evans concluded that Plaintiff had chronic cervical neck, trapezius, and arm pain, "most

7    consistent with myofascial pain syndrome," and "mild cervical degenerative disk disease." (AR

8    170.) In his findings, he notes that, "I am not impressed by patient's cervical spine findings on

9    examination in relation to the level of discomfort that she has," and that "I am more impressed that

10   patient's work as a hair stylist and use of her upper extremities contributes to a myofascial pain

11   syndrome, rather than a full blown fibromyalgia." (AR 170.) Dr. Evans recommended using

12   Ibuprofen  800mg and Magnesium 200-400mg, "smoking cessation," and seeking courses available

13   at Kaiser (though the type of course is not specified). (AR 171.) He also noted that Plaintiff "has

14   benefitted from trigger injections during severe flare ups." (AR 171.)

15   On July 13, 2002, G. Hoffman, M.D., examined Plaintiff for complaints of upper back and

16   neck pain. (AR 167-68.) Dr. Hoffman found that Plaintiff's neck and upper shoulder area was

17   tender. (AR 168.) He assessed chronic neck pain and prescribed Vicodin, Flexeril 10mg, and

18   Mortrin 800mg. (AR 168.)

19   On July 27, 2002, M. Quirk, D.O., examined Plaintiff for complaints of chronic neck pain

20   and neck spasms. (AR 165-66.) Dr. Quirk found that Plaintiff's lymphatic system was tender and

21   recommended Iodine 400mg, Flexeril, and heat treatment. (AR 166.)

22   On October 1, 2002, Dr. Quirk examined Plaintiff due to neck pain, spasms, and slight

23   numbness in her hand. (AR 163-64.) Dr. Quirk prescribed Iodine 400g and Flexeril 10g. (AR 164.)

24   On April 24, 2003, Dr. Quirk examined Plaintiff due to neck spasms. (AR 156-57.) Plaintiff

25   complained that cervical spine pain emerged with damp weather and that she experienced the "same

26   neck problems as before." (AR 156.) Dr. Quirk found Plaintiff had soft tissue and was hyperactive

27   to touch. (AR 157.) Dr. Quirk recommended that Plaintiff "ice [or] heat" the area, and prescribed

28

4

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Iodine 400mg, Flexeril 10g, and Ultrom 50 in addition to the Iodine and Elavil she was already

2    taking.  (AR 156-57.)

3         On April 5, 2004, Tanya L. Hills, D.C., conducted physical, neurological, and orthopedic

4    examinations.  (AR 243-50.)  Dr. Hills found that Plaintiff's cervical flexion was at "40," extension

5    at "50," left rotation was at 80 degrees, and her right rotation was at 80 degrees but with the presence

6    of pain.  (AR 243.)  Plaintiff's thoraco-lumbar flexion was at "90," extension at "20," left rotation at

7    45 degrees, and right rotation at 45 degrees with the presence of pain.  (AR 243.)  Dr. Hills

8    administered several orthopedic and neurological tests, such as "leg lowering" and the "shoulder

9    depressor," while Plaintiff was sitting, standing, and supine, to test Plaintiff's right and left side

10   reactions.  (AR 244.)  Although the results varied, the left side had a "negative" reaction three

11   times, while the right side had a "negative" reaction to the tests four times.  (AR 244.)  Dr. Hills

12   indicated that both her right and left side experienced some neck pain, but did not elaborate further.

13   (AR 244.)

14        In her case history notes, dated April 6 and 28, 2004, Dr. Hills noted that Plaintiff had severe

15   neck, upper back, and shoulder pain, swollen ankles, muscle spasms, fatigue, and headaches.  (AR

16   245.)  Although Plaintiff did not return for follow-up treatment, Dr. Hills opined that Plaintiff was

17   "unable to continue her hairdressing profession," and that Plaintiff was "disabled physically to do

18   lifting, carrying, handling heavy objects, standing or sitting over 30 minutes at a time."  (AR 245.)

19        On May 3, 2004, Rene Miranda, M.D., diagnosed Plaintiff with cervical neck strain and

20   spasm.  (AR 317-20.)  Dr. Miranda recommended "rest, ice and/or heat to neck, gentle stretch[ing]"

21   and Ibuprofen 600mg, Flexeril 10mg, and Vicodin 500mg.  (AR 318.)  She noted that Plaintiff could

22   return to work on May 7, 2004.  (AR 318.)

23        On May 29, 2004, Mark G. Willis, M.D., treated Plaintiff for neck pain and spasms.  (AR

24   306-16.)  Dr. Willis noted her spinous processes were "minimally tender" and there was "no

25   evidence of trauma," with a range of motion and normal forward flexion and extension.  (AR 306.)

26   He found that the pain was caused by "exacerbation of chronic neck, upper back pain, and spasm,"

27   and prescribed Toradol 60mg and Naprosyn 500, Robaxin 650, Vicodin.  (AR 307.)  Dr. Willis

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1  recommended that she follow up with her doctor at a health clinic for further problems. (AR 307.)

2  On September 14, 2004, Eric L. Sterling, M.D., examined Plaintiff for complaints of chronic

3  neck pain. (AR 295-96, 301-04.) In an Emergency Department Report, Dr. Sterling found Plaintiff

4  in "mild distress," with a supple neck and "mild tenderness with full range of motion." (AR 295.)

5  He found that her "symptoms were most consistent with musculoskeletal neck pain, although

6  because of chronicity, [he] could not exclude disk disease or other structural lesions." (AR 295.) He

7  recommended she discuss the possibility of Magnetic Resonance Imaging ("MRI") with her doctor.

8  (AR 295.) Dr. Sterling also recommended Motrin, Vicodin, and Soma for pain. (AR 296.)

9  On September 17, 2004, Dr. Sterling reexamined Plaintiff for neck pain caused by lifting

10  firewood two weeks prior. (AR 297-300, 305.) Plaintiff indicated she experienced a level seven to

11  eight of pain on a ten-point scale in her upper back and neck. (AR 299.) Dr. Sterling diagnosed

12  Plaintiff with a neck spasm and recommended gentle stretching, Vicodin 500mg, and Ibuprofen.

13  (AR 305.)

14  From January 11, 2005 through March 8, 2005, Plaintiff underwent physical therapy. (AR

15  223-38.) In a Discharge Summary Report dated March 8, 2005, the physical therapist concluded

16  that Plaintiff made no progress over this period of time. (AR 223.) Plaintiff underwent treatment of

17  the C-spine designed to mobilize joints, soften tissue, strengthen, stretch, and ice painful spots. (AR

18  223.) The physical therapist noted that "sitting and lifting heavy objects still irritated her neck."

19  (AR 223.) In the report, Plaintiff indicated that her neck pain level was 10 out of 10, with 10

20  indicating extreme pain. (AR 223.) Plaintiff's ability to rotate her left side was at 50 degrees, while

21  her right side's rotation was 70 degrees. (AR 223.) The physical therapist recommended "improving

22  cervical and upper body strength and upper cervical flexibility." (AR 223.)

23  On February 14, 2005, Clinical Psychologist Jay L. Danzig, Ph.D., examined Plaintiff's

24  verbal, numerical, perceptual, and vocational abilities. (AR 193-95.) Dr. Danzig found that

25  Plaintiff's verbal abilities and reading comprehension score of 73 percent indicated a limited

26  vocabulary, subject to mis-definition. (AR 193.) Based on her results, Dr. Danzig suggested that

27  Plaintiff "would be unable to handle the reading requirements of most occupations, and it's quite

28

6

1    likely that she has a specific learning disability in this area." (AR 193.) He stated that Plaintiff

2    needed "an on-the-job training approach which utilizes rote, repetition and direct role modeling as

3    learning modalities." (AR 193.) He found that Plaintiff demonstrated fair conversational capacities

4    during the assessment process. (AR 193-94.) Dr. Danzig also noted that her expressive vocabulary

5    was at the 15th percentile, indicating that Plaintiff literally became "tongue tied" when placed in

6    performance situations. (AR 193.) Dr. Danzig also found that Plaintiff's verbal reasoning

7    performance was at the 40th percentile with only 63 percent accuracy, indicating that Plaintiff "often

8    becomes confused and arrives at illogical conclusions when asked to deal with complicated written

9    material." (AR 193.) He concluded that "[i]t would be extremely difficult for her to rely upon

10   written material as a way of acquiring new vocational skills." (AR 194.)

11          Using an Employee Aptitude Survey to assess Plaintiff's ability to work with numbers, Dr.

12   Danzig found that Plaintiff's processing speed was far below industry standards, but she was

13   perfectly accurate in her ability to work with detailed clerical material. (AR 194.) In addition, using

14   the Wide Range Achievement Test to assess Plaintiff's basic computational operations in an untimed

15   situation, Dr. Danzig found that Plaintiff "would feel most comfortable in jobs which did not include

16   a computational demand." (AR 194.) Dr. Danzig determined that Plaintiff performed at a sixth

17   grade level and was able to add, subtract, multiply and divide with simple whole numbers only, not

18   fractions, long division, decimals, or percentages. (AR 194.) Furthermore, Dr. Danzig's assessment

19   of Plaintiff's ability to "visualize three-dimensional objects mentally in the mind's eye" indicated she

20   took "three to four times longer than the average person to grasp the test instructions." (AR 194.)

21   He found that once she understood the concepts, she worked "quite accurately." (AR 194.)

22   However, Dr. Danzig found that Plaintiff was "not likely to feel comfortable in any job which

23   require[ed] her to deal with complexity and/or novelty," and that an in-depth psychological

24   evaluation would be useful in determining underlying emotional issues disrupting her ability to

25   focus and concentrate. (AR 194.)

26          As to Plaintiff's vocational abilities, Dr. Danzig opined that "Ms. Gallo is not yet ready to

27   pursue full time competitive employment and will need to consolidate psychological issues before

28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

UNITED STATES DISTRICT COURT
For the Northern District of California

1  she is ready to return to work on a full time basis." (AR 195.) Dr. Danzig further noted the clinical

2  data suggested "at least a moderate depression," including apprehension, insecurity, and worry. (AR

3  195.) He also found that Plaintiff was shy, threat sensitive, over-reactive to negative feedback, and

4  that her frustration tolerance was impaired when it came to working closely with others. (AR 195.)

5  Dr. Danzig observed that Plaintiff selectively reported information to cast herself in a more

6  favorable light than in actuality of the case. (AR 194.) Dr. Danzig's assessment of Plaintiff's

7  Education Orientation Score suggested that she preferred on-the-job training, working

8  independently, and possibly working with children. (AR 195.) He found Plaintiff's "restrictiveness"

9  was likely due to underlying apprehension about her ability to work. (AR 195.)

10      On February 16, 2005, Dr. Sterling examined Plaintiff with respect to complaints of back and

11  lower extremity pain. (AR 286-87.) Plaintiff complained of "spasm-like" pain and noted that taking

12  Vicodin for the pain did not provide relief. (AR 286.) In his emergency department report, Dr.

13  Sterling noted that Plaintiff had been doing physical therapy and some exercises for her knees. (AR

14  286.) Dr. Sterling performed a physical examination and found Plaintiff had a supple neck and

15  extremities that were "remarkable for musculoskeletal tenderness in the lateral calf and lower back

16  that is palpable and reproducible. (AR 286.) No point tenderness or masses noted." (AR 286.) Dr.

17  Sterling noted that Plaintiff appeared in mild distress, and felt the symptoms were consistent with

18  musculoskeletal pain of the back and lower extremities. He gave Plaintiff an IM injection of

19  Toradol and a muscle relaxant. (AR 286.)

20      On March 23, 2005, Plaintiff completed a Social Security Administration ("SSA") Function

21  Report. (AR 117-24.) Plaintiff reported that in an average day she attempts to do exercises in spite

22  of her pain, takes pain medication, watches television for six hours a day, eats, pays bills, fills out

23  paperwork, lays down and reads, and cares for her cat. (AR 117, 121.) Plaintiff stated she has

24  trouble sleeping due to tension in her arms, aches, and worrying. (AR 118.) She reported she could

25  dress, shower (but not bathe), feed herself, and use the toilet on her own, but could not style her hair

26  and had difficulties shaving. (AR 118.) Plaintiff also reported that she could make her own meals

27  two to three times per week, taking approximately forty-five minutes to two hours. (AR 119.) In

28

regards to house and yard work, Plaintiff reported she could change her sheets twice a month, do laundry once a week, wash dishes nightly, wipe the counters, and clean up after her cat twice a week. (AR 119.) However, she also stated that her son helped her by doing his own laundry, vacuuming, cleaning the bath tub, and performing yard work such as shoveling, weeding, and putting out the trash bins. (AR 119.) She indicated that she went outside three times a week, drove and rode in a car, went out alone, and shopped in stores once every two weeks for two-hour increments. (AR 120.) Although her social activities decreased since her injury, Plaintiff reported that she talked on the phone daily, went to church, physical therapy, and the bank. (AR 121.) She stated she had no problem getting along with others, but felt isolated. (AR 122.)

According to Plaintiff, lifting more than eight pounds, standing for more than five minutes, bending forward or backward, reaching, sitting, climbing, kneeling, and walking contribute to her neck or knee pain. (AR 122.) When walking on a "good" day, Plaintiff reported she needs to stop after three minutes, resting for ten minutes before continuing. (AR 122.) She also noted that she felt depressed, afraid, and anxious about her pain and ability to work, and had difficulty with past jobs because of "neck flare-ups." (AR 123.) Plaintiff reported she uses a cervical collar prescribed to her in March 2005, medication, and a brace/splint. (AR 124.) She indicated that her pain affects her memory, concentration, ability to get along with others, and ability to complete tasks. (AR 124.)

On March 28, 2005, Plaintiff's son, Jameson J. Foley completed an Adult Third Party SSA Function Report. (AR 144-52.) Mr. Foley's report is consistent with Plaintiff's SSA Function Report. (AR 144.)

On April 7, 2005, Antoine Dipsia, M.D., reviewed Plaintiff's records and prepared a supplemental Residual Functioning Capacity ("RFC") continuation sheet. (AR 183-92.) Dr. Dipsia found that Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, work six hours in an eight-hour workday, and push and/or pull without restriction. (AR 184.) Dr. Dipsia noted that Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl, (AR 185), and was limited in reaching all directions, including overhead. (AR 186.)

Dr. Dipsia also prepared a Consultation Report with respect to Plaintiff's neck and right knee.

UNITED STATES DISTRICT COURT
For the Northern District of California

1   (AR 189-92.)  In the report, Dr. Dipsia noted that Plaintiff suffered from "mild distress," "neck

2   supple" and "low back tenderness."  (AR 189.)  Based on his analysis of Plaintiff's medical record,

3   Dr. Dipsia opined that Plaintiff's neck pain complaints were "partially credible," and that there was

4   "[n]o indication of any sensory loss."  (AR 190.)  Dr. Dipsia further opined that Plaintiff's right knee

5   pain complaints were "partially credible" due to the cyst in the knee, and that although the knee was

6   tender, there was "no indication of any abnormalities of gait."  (AR 190.)  Dr. Dipsia found that

7   although Plaintiff was slowed by discomfort and pain, she was able to perform daily life activities,

8   as detailed above.  (AR 190.)  Dr. Dipsia concluded that she could perform occasional light work

9   and  recommended a psychiatric assessment for potential depression.  (AR 190.)

10          From April 26, 2005 to July 11, 2005, Plaintiff underwent physical therapy, for a total of

11   twenty sessions.  (AR 215-22.)  Plaintiff indicated that her pain as 5 out of 10, 10 indicating extreme

12   pain.  (AR 215.)  In a Progress Report dated June 16, 2006 and a Discharge Summary Report date

13   July 11, 2005, the physical therapist reported that Plaintiff made "minimal" progress.  (AR 215,

14   218.)  The physical therapist noted that the stiffness of C-T spin pain had improved, and that

15   Plaintiff's ability to rotate her left side improved from 58 to 83 degrees, while her right side's

16   rotation improved from 30 to 76 degrees.  (AR 215.)

17          On May 4, 2005, Michaela Sheppard, M.D., examined Plaintiff for complaints of severe neck

18   pain.  (AR 275-85.)  In an Emergency Department Report, Dr. Sheppard noted that Plaintiff was a

19   "very tearful and in obvious distress secondary to pain."  (AR 276.)  Dr. Sheppard reported that

20   Plaintiff's neck was "supple" and "easily bent," with "marked tenderness" and "palpable spasms."

21   (AR 276.)  While there was tenderness just left to the C-spine, the thoracic spine and posterior

22   spinous processes of the upper cervical spine were not tender.  (AR 276.)  Dr. Sheppard found that

23   Plaintiff's central nervous system motor skills were 5/5 and her reflexes were without asymmetry.

24   (AR 276.)  Dr. Sheppard discharged Plaintiff in stable condition and prescribed Vicodin for pain and

25   Flexeril or Robaxin for muscle spasm.  (AR 278.)

26          On June 8, 2005, Dr. Brown requested an MRI of Plaintiff's cervical spine.  (AR 239.)  The

27   MRI revealed "a left paracentral focal disc protrusion of mild degree" and "only mild central spinal

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1  canal compromise." (AR 239.) The findings indicated that "[t]he cervical cord appears

2  unremarkable" and the foramen magnum appears "patent" and "normal." (AR 239.)

3       On June 10, 2005, Albert J. Kastl, Ph.D., prepared a Psychological Report, in which he

4  assessed Plaintiff's cognitive ability, memory skills, and visual-motor functions. (AR 196-99.) Dr.

5  Kastl found that Plaintiff was particularly strong in nonverbal test areas, despite some reduced

6  psychomotor speed. (AR 197.) Dr. Kastl noted that verbally, Plaintiff could define basic words and

7  "grasp conceptual relationships such as the similarity of steam and fog." (AR 197.) Dr. Kastl found

8  that although Plaintiff performed "better" on tests of the battery, she had difficulty with tasks heavily

9  dependent on academic achievement such as multiplying 6 by 25, and "her overall I.Q. score of 76

10  would fall in the borderline range." (AR 197.) Plaintiff's overall memory results fell within the low-

11  average range. (AR 197.) Dr. Kastl observed that Plaintiff was "well oriented to time, place, and

12  person," and there was no evidence of "hallucinatory activity, suicidal ideation, [or] profound

13  depression." (AR 199.) Though Plaintiff stated that she became depressed "unpredictably and

14  suddenly," "[t]here is no history of treatment for depression." (AR 199.) Dr. Kastl concluded as

15  follows:

16         The overall diagnostic impression is of mood disorder (depression)
       due to chronic pain syndrome [. . .] and borderline intellectual

17         functioning. However, the level of functioning is largely related to
       academic issues and would not be discerned by the general public,

18         who would assume her to be of average or at least low-average
       intelligence. The claimant would be able to relate productively to

19         co-workers, supervisors, and the general public. There is no
       evidence of emotional deterioration in work-like settings. Her

20         concentration, persistence, and pace would fall in the low average
       range, consistent with her overall memory skills. She is able to

21         manage funds.

22  (AR 199.)

23       On July 5, 2005, Disability Determination Services ("DDS") tested Plaintiff's mental

24  functioning and limitations, examining Plaintiff's understanding and memory, sustained

25  concentration and persistence, social interaction, and ability to adapt. (AR 204-09.) In a Mental

26  Residual Functional Capacity Assessment report, DDS noted that Plaintiff was not significantly

27  limited in most areas, but was moderately limited in her ability to understand, remember and carry

28

11

UNITED STATES DISTRICT COURT
For the Northern District of California

1   out detailed instructions.  (AR 204.)  Also on July 5, 2005, DDS completed a Psychiatric Review

2   Technique Form.  (AR 210-14.)  DDS found that there was (1) no restriction of activities of daily

3   living; (2) mild difficulties in maintaining social functioning; (3) moderate difficulties in

4   maintaining concentration, persistence, or pace; and (4) insufficient evidence to establish episodes of

5   decompensation, each of extended duration.  (AR 213.)

6           On September 28, 2005, Jeffrey W. Ralph, M.D., evaluated Plaintiff using Electromyography

7   ("EMG") and nerve conduction studies.  (AR 453.)  Dr. Ralph found Plaintiff's "right upper

8   extremity normal" and that "no evidence for either ulnar neuropathy or cervical radiculopathy to

9   explain her symptoms."  (AR 453.)

10          On September 29, 2005, Christopher P. Ames, M.D., completed a neurosurgical spine

11  evaluation of Plaintiff.  (AR 452.)  Dr. Ames reported that Plaintiff complained of severe right

12  parascapular and neck pain, with occasional but not significant pain down the arm.  (AR 452.)  Dr.

13  Ames noted that she "does not have any left-sided symptoms" or a "real trial of conservative

14  treatment, except for one injection of Toradol," and appeared to be of normal strength.  (AR 452.)

15  The MRI revealed a "left-sided C6-7 disc bulge, without any significant cord narrowing or foraminal

16  compromise."  Dr. Ames recommended conservative treatment with an epidural steroid injection.

17  (AR 452.)

18          On October 26, 2005, David J. Lee, M.D., treated Plaintiff with the first of a series of three

19  cervical epidural steroid injections for right parascapular pain and neck pain.  (AR 384-89.)  Dr. Lee

20  found there was "no apparent distress," and that Plaintiff was "resting comfortably," with a neck

21  "limited in forward flexion secondary to discomfort."  (AR 384.)  However, Dr. Lee noted that

22  "[e]xtension reproduces radiculopathy-type pain in the right upper extremity," but "lateral bending is

23  intact and symmetric."  (AR 384.)  Dr. Lee established the following plan: (1) Cervical epidural

24  steroid injection today; (2) Continue current medical regimen; (3) Consider utilizing physical

25  therapy; and (4) Patient to return to clinic in approximately one month for follow up assessment.

26  (AR 385.)

27          On November 7, 2005, Susan Regan, M.D., a medical advisor with DDS, performed a

28

12

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1   Mental Residual Functional Capacity Assessment of Plaintiff.  (AR 251-60.)  Dr. Regan reported

2   that Plaintiff was moderately limited in her ability to: understand and remember detailed

3   instructions; carry out detailed instructions; maintain attention and concentration for extended

4   periods; complete a normal workday and workweek without interruptions; interact appropriately

5   with the general public; and respond appropriately to changes in the work setting.  (AR 251-52.)  Dr.

6   Regan indicated that Plaintiff had no significant to moderate restrictions on the activities of daily life

7   and social interaction.  (AR 253.)  She determined that Plaintiff "can do simple one and two step

8   tasks, limited to contact with the public due to depression and fatigue."  (AR 253.)

9          On November 16, 2005, DDS compiled a Case Activities Report, which indicates that

10   Plaintiff's symptoms include failure to put arms up and neck in a down position for an extended

11   period.  (AR 415-21.)  The report indicates that Plaintiff was prone to muscle spasms, unable to lift

12   heavy objects, stand with arms up in the air, or perform any job that required the head to be in one

13   position for a length of time without the presence of pain, numbness, and fatigue.  (AR 416.)

14          On December 14, 2005, Greg A. Hamon, M.D., performed an excision of minscal remnant

15   inside Plaintiff's right knee.  (AR 268-69.)  In the Operative Report, Dr. Hamon noted that he

16   removed a "small piece of floating meniscus" lodged in the right superior portion of her knee that

17   was "bothersome, painful when she walk[ed]."  (AR 268.)  Dr. Hamon reported that there were no

18   complications while operating on Plaintiff's right knee.  (AR 269.)

19          On December 30, 2005, Dr. Hamon completed a Medical Questionnaire based upon his

20   December 20, 2005 follow-up examination of Plaintiff.  (AR 262-63.)  Dr. Hamon determined that

21   no permanent impairments were expected to arise after removing the tumor from the right knee.

22   (AR 263.)  He noted that Plaintiff could return to her job without restriction.  (AR 262.)

23          On January 9, 2006, Craig A. Campbell, M.D., conducted an Orthopaedic Consultation.  (AR

24   414.)  Dr. Campbell indicated that Plaintiff had a right knee mass "localized to the anterolateral

25   aspect of the knee."  (AR 414.)  He reported that Plaintiff "does not have much pain but it has

26   prevented her from squatting or kneeling on this side."  (AR 414.)  In addition, Dr. Campbell stated

27   that Plaintiff's current medication included two Vicodin a day, and Flexeril and Paxil at nighttime as

28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1   needed.  (AR 414.)  Dr. Campbell noted that the "surgical pathology was consistent with a giant cell

2   tumor of the tendon sheath."  (AR 414.)  His physical examination of Plaintiff revealed that despite

3   "some mild tenderness to palpation," "[i]t does not appear to be affixed to the deep structures of the

4   knee," and "she is motor, sensory and vascularly intact."  (AR 414.)

5          On January 18, 2006, Rebecca Norwick, FNP, evaluated Plaintiff for her neck and back pain.

6   (AR 321-23.)  Ms. Norwick determined that Plaintiff could not return to her usual job due to a

7   severe impairment, which required future and current medical care and could possibly be permanent.

8   (AR 321.)  Ms. Norwick based her conclusion on Plaintiff's subjective complaints, abnormal

9   physical examination findings, and relevant diagnostic test results of her "cervical spine [and] giant

10  cell tumor of tendon sheath."  (AR 322.)

11         On January 31, 2006, Gene Babbit, M.D., reviewed six MRI views of Plaintiff's spine and

12  lower back.  (AR 265-67, 288-94.)  Dr. Babbit determined that there was "no evidence for fracture

13  or malalignment."  (AR 265.)  Dr. Babbit's impression included "minimal degenerative change," but

14  "[o]therwise no significant abnormality radiographically."  He suggested a follow-up MRI if

15  symptoms persisted.  (AR 265, 288.)

16         On February 9, 2006, Michael Bollinger, M.D., treated Plaintiff for a right anterior lateral

17  knee mass.  (AR 353-69.)  Dr. Bollinger performed two procedures: (1) a diagnostic arthroscopy and

18  arthroscopic debridement and microfracture of area of chondromalacia patella; (2) and an open

19  excision of the anterior lateral right knee mass.  (AR 353.)  Dr. Bollinger reported that Plaintiff

20  "tolerated the procedure well."  (AR 354.)  The following day, on February 10, 2006, Hong Luo,

21  M.D., prepared a Surgical Pathology Report.  (AR 360.)  Dr. Lou and Steve Mertens, M.D.,

22  concurred with Dr. Bollinger after a microscopic examination of the soft tissue in the right knee.

23  (AR 360-61.)

24         On February 22, 2006, Dr. Lee treated Plaintiff with a second cervical epidural steroid

25  injection.  (AR 381-82.)  Since Plaintiff's October 26, 2005 visit, she experienced 60 to 70 percent

26  relief from her arm and neck pain.  (AR 381.)  Plaintiff reported that her pain had decreased from 8

27  out of 10, with 10 being most painful, to 5 out of 10.  (AR 381.)

28

14

UNITED STATES DISTRICT COURT
For the Northern District of California

1   On March 14, 2006, Dr. Campbell assessed Plaintiff's recovery from the February 9, 2006

2   operation with Dr. Bollinger.  (AR 413.)  Dr. Campbell found that the Plaintiff was "doing very well

3   without any significant pain," and that "she has a full range of motion without pain."  (AR 414.)

4   Plaintiff felt some occasional feeling of tightness, but Dr. Campbell noted that "this usually occurs

5   towards the end of the day but resolves quickly."  (AR 413.)

6   On May 24, 2006, Dr. Lee treated Plaintiff with a third injection of cervical epidural steroid

7   to relieve her neck pain.  (AR 431-32.)  Since Plaintiff's October 26, 2005 and February 22, 2006,

8   Plaintiff "denied any weakness of her upper extremities or any new sensory changes."  (AR 431.)

9   Dr. Lee noted he would continue treating Plaintiff with epidural steroid injections.  (AR 431-32.)

10  **C.      Procedural Background**

11  On February 24, 2005, Plaintiff filed an application for supplemental security income ("SSI")

12  and disability insurance benefits ("DIB") under Titles II and XVI of the Social Security Act, alleging

13  disability beginning on January 11, 2005.  (AR 20, 90-95.)  Plaintiff was 41 years old at the time she

14  filed her application.  (AR 20.)  The Social Security Administration ("SSA") denied her applications

15  initially, (AR 70-74), and upon reconsideration, (AR 68-69).  Plaintiff subsequently filed a request

16  for a hearing.  (AR 20.)

17  On June 8, 2006, Administrative Law Judge ("ALJ") Richard Wurdeman heard Plaintiff's

18  case.  (AR 26-67.)  Plaintiff appeared at the hearing represented by her attorney, Carolyn A. Young.

19  Gene Johnson testified as an impartial vocational expert.  On September 22, 2006, ALJ Wurdeman

20  concluded that Plaintiff was not disabled under the Social Security Act.  (AR 25.)  ALJ Wurdeman's

21  decision became the final decision of the Commissioner when the Appeals Council declined to

22  review on January 11, 2007.  (AR 9-11.)

23  **D.      The ALJ's Findings**

24  The regulations promulgated by the Commissioner of Social Security provide for a five-step

25  sequential analysis to determine whether a Social Security claimant is disabled.  20 C.F.R §

26  404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  The sequential inquiry is terminated

27  when "a question is answered affirmatively or negatively in such a way that a decision can be made

28

15

UNITED STATES DISTRICT COURT
For the Northern District of California

1    that a claimant is or is not disabled." *Pitzer v. Sullivan*, 908 F.2d 502, 504 (9th Cir. 1990).

2        The ALJ must first determine whether the claimant is performing "substantial gainful

3    activity," which would mandate that the claimant be found not disabled regardless of medical

4    condition, age, education, and work experience.  20 C.F.R. § 404.1520(b).  Here, ALJ Wurdeman

5    determined that Plaintiff had not performed substantial gainful activity since January 11, 2005, her

6    alleged onset disability.  (AR 24.)

7        At step two, the ALJ must determine whether the claimant has a medically severe

8    impairment or combination of impairments.[3]  If the claimant does not have a severe impairment or

9    combination of impairments, disability benefits are denied.  20 C.F.R. § 404.1520(c).  Here, ALJ

10   Wurdeman determined the evidence established that Plaintiff "has the severe impairments of

11   degenerative disk disease of the cervical spine and depression."  (AR 24.)  ALJ Wurdeman

12   determined that Plaintiff's "right knee cyst and mild degenerative disk disease of the lumbar spine do

13   not represent severe impairments."  (AR 24.)

14       If the ALJ determines that the claimant has a severe impairment, the ALJ proceeds to the

15   third step to determine whether it meets or equals an impairment in the Listing of Impairments.  20

16   C.F.R. § 404.1520(d); 20 C.F.R. § 416.920(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1.  If claimant's

17   impairment either meets the listed criteria for the diagnosis or is medically equivalent to the criteria

18   of the diagnosis, the claimant is conclusively presumed to be disabled.  20 C.F.R. § 404.1520(e).

19   Here, ALJ Wurdeman determined that Plaintiff's "severe impairments do not meet or equal any

20   listed impairments of Appendix 1, Subpart P of Social Security Administration Regulation No. 4."

21   (AR 24.)

22       The fourth step of the evaluation process requires that the ALJ determine whether the

23

24   ──────────────

25       [3] At step two, "severe" means any impairment or combination of impairments that
     significantly limits claimant's physical or mental ability to perform basic work activities.  20 C.F.R.
26   §§ 404.1520(c), 416.920(c).  This is a de minimis inquiry designed to weed out nonmeritorious
     claims at an early stage in the analysis.  *Bowen v. Yukert*, 482 U.S. 137, 148, 153-4 (1987).  "[O]nly
27   those claimants with slight abnormalities that do not significantly limit any basic work activity can
     be denied benefits" at step two of the analysis.  *Id.* at 158.
28

claimant's Residual Functional Capacity ("RFC") prevents the claimant from performing past relevant work. 20 C.F.R. § 404.1520(e). RFC refers to what an individual can do in a work setting despite limitations caused by medically determinable impairments. 20 C.F.R. § 416.945(a). When assessing an individual's RFC, the ALJ must consider the claimant's symptoms (including pain) and signs of laboratory findings, together with other evidence. 20 C.F.R. § 404, Subpt. P, App. 2 § 200.00(c). If the claimant is able to perform work which he or she performed in the past, a finding of "not disabled" is made and disability benefits are denied. 20 C.F.R. § 416.920(e). Here, ALJ Wurdeman determined that Plaintiff has the following RFC:

> Claimant has an RFC for a range [of] work at the sedentary exertional level with limitation to 45 degree rotation of the head a preclusion from full flexion of the neck. In addition, claimant is precluded from work requiring remembering and carrying out detailed instructions and her ability to maintain concentration is in the low average range.

(AR 24.)

In the fifth step of the analysis, the burden shifts to the ALJ to prove that there are other jobs existing in significant numbers in the national economy which the claimant can perform consistent with the medically determinable impairments and symptoms, functional limitations, age, education, work experience and skills. 20 C.F.R. § 404.1520(a)(4)(v); 20 C.F.R. § 404.1560(c). A claimant is entitled to disability benefits only if he or she is not able to perform other work. 20 C.F.R. § 404.1520(g); 20 C.F.R. § 416.920(f). Here, ALJ Wurdeman determined that Plaintiff is not capable of performing her past relevant work as a cosmetologist. (AR 24.) However, he opined that "[c]onsidering the above RFC" and "unskilled sedentary jobs" identified by Vocational Expert Gene Johnson, Plaintiff "is capable of performing other jobs that exist in significant numbers." (AR 23-24.) These jobs include employment as a "Mail Clerk" and/or "Credit Checker." (AR 23.) As such, ALJ Wurdeman determined that Plaintiff is not disabled. (AR 24-25.)

### III.   LEGAL STANDARD

This Court has jurisdiction to review final decisions of the Commissioner pursuant to 42 U.S.C. § 405(g). The ALJ's decision must be affirmed if the findings of fact are "supported by substantial evidence and if the [ALJ] applied the correct legal standards." *Holohan v. Massanari*,

17

UNITED STATES DISTRICT COURT
For the Northern District of California

246 F.3d 1195, 1201 (9th Cir. 2001) (citation omitted).  Substantial evidence means more than a

scintilla, but less than a preponderance, or evidence which a reasonable person might accept as

adequate to support a conclusion.  *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).  The

court must consider the administrative record as a whole, weighing both the evidence that supports

and detracts from the ALJ's conclusion.  *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989).

However, where the evidence is susceptible to more than one rational interpretation, the court must

uphold the ALJ's decision.  *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).

Determinations of credibility, resolution of conflicts in medical testimony, and all other ambiguities

are to be resolved by the ALJ.  *Id*.  Additionally, the harmless error rule applies where substantial

evidence otherwise supports the ALJ's decision.  *Curry v. Sullivan*, 925 F.2d 1127, 1131 (9th Cir.

1990) (citation omitted).

## IV.  ISSUES PRESENTED

Plaintiff seeks reversal of ALJ Wurdeman's denial of disability insurance benefits and

supplemental security income, arguing the following:

1.    The ALJ improperly discredited Plaintiff's testimony;

2.    The ALJ Improperly evaluated Plaintiff's RFC; and

3.    The ALJ Improperly determined that Plaintiff could perform the jobs suggested by the

      Vocational Expert.

## V.  DISCUSSION

**A.    Plaintiff's Failure to Oppose Defendant's Cross-Motion**

As a preliminary matter, the Court notes that Plaintiff did not file a reply brief in support of

her motion and in opposition to Defendant's cross-motion for summary judgment.  Plaintiff's counsel

filed a declaration stating that Plaintiff had no duty to file an opposition and/or reply.  (Dkt. #32.)

While the Court agrees that Plaintiff had no duty to oppose Defendant's cross-motion, the record

now reflects that Defendant's motion is unopposed.  Accordingly, for the reasons argued in

Defendant's motion, the Court finds that summary judgment should be granted in favor of Defendant

and against Plaintiff.  Alternatively, summary judgment should be granted in favor of Defendant for

1    the reasons set forth below.

2

3    **B.      Whether ALJ Wurdeman Properly Discredited Plaintiff's Testimony.**

4          Plaintiff first argues that ALJ Wurdeman improperly discounted the credibility of her

5    testimony with regard to her pain and functional limitations.  Specifically, Plaintiff argues that the

6    ALJ failed to make a finding as to whether her "impairments present may reasonably have caused

7    the reported symptoms," and he "did not include consideration of the consistency between the

8    testimonial and the written statements, even though this is a mandatory consideration."  (Pl.'s Mot.

9    at 9:3-11.)  Plaintiff also contends that the ALJ "did not even acknowledge Plaintiff's written

10   statements," and "did not include consideration of the consistency between the testimonial and the

11   written statements, even though this is a mandatory consideration."  (Pl.'s Mot. at 9:7-11.)

12         "To determine whether a claimant's testimony regarding subjective pain or symptoms is

13   credible, an ALJ must engage in a two-step analysis."  *Lingenfelter v. Astrue*, 504 F.3d 1029, 1036

14   (9th Cir. 2007).  "First, the ALJ must determine whether the claimant has presented objective

15   medical evidence of an underlying impairment 'which could reasonably be expected to produce pain

16   or other symptoms alleged.'"  *Id.* at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir.

17   1991)(en banc)).  "The claimant, however, 'need not show that her impairment could reasonably be

18   expected to cause the severity of the symptom she has alleged; she need only show that it could

19   reasonably have cause some degree of the symptom.'"  *Id.* (quoting *Smolen*, 80 F.3d at 1282).

20         Second, if the ALJ determines that the claimant has presented objective medical evidence,

21   and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the

22   severity of her symptoms only by offering specific, clear and convincing reasons for doing so."  *Id*.

23   (quoting *Smolen*, 80 F.3d at 1281).  Such specificity is crucial so as to enable effective judicial

24   review.  *Mersman v. Halter*, 161 F. Supp. 2d 1078, 1086 (N.D. Cal. 2001) ("The lack of specific,

25   clear, and convincing reasons why Plaintiff's testimony is not credible renders it impossible for [the]

26   Court to determine whether the ALJ's conclusion is supported by substantial evidence."); SSR 96-7p

27   (the ALJ's decision "must be sufficiently specific to make clear to the individual and to subsequent

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1   reviewers the weight the adjudicator gave to the individual's statements and reasons for that

2   weight").  Where the ALJ "has made specific findings justifying a decision to disbelieve an

3   allegation of excess pain, and those findings are supported by substantial evidence in the record,"

4   courts must not engage in second-guessing.  *Fair v. Bowen*, 885 F.2d at 597, 604 (9th Cir. 1996).

5         In his decision, ALJ Wurdeman found that Plaintiff has the severe impairments of

6   degenerative disk disease of the cervical spine and depression.  (AR 21.)  However, he determined

7   that Plaintiff's symptom allegations were "not fully credible to the extent that they are inconsistent

8   with the medical evidence indicating the capacity to perform a range of work at the sedentary

9   exertional level."  (AR 22.)  In making this determination, the Court finds that the ALJ offered

10  specific, clear and convincing reasons for doing so, as detailed below.

11        Plaintiff contends that the ALJ's "brief finding was not accompanied by specifics."  (Pl.'s

12  Mot. at 8:7-9.)  However, ALJ Wurdeman specifically noted that the objective medical evidence,

13  which showed only conservative treatment, did not support Plaintiff's symptom allegations.  (AR 22-

14  23.)  *See* 20 C.F.R. § 416.929(c)(3)(iv), (v) (medication and treatment history relevant to

15  credibility).  "[E]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony

16  regarding severity of an impairment."  *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007) (citing

17  *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995)); *see also Tommasetti*, 533 F.3d at 1039

18  (claimant not credible because "he did not seek an aggressive treatment program and did not seek an

19  alternative or more-tailored treatment program").

20        ALJ Wurdeman cited to Santa Rosa Memorial Hospital progress and discharge reports,

21  which detail treatments Plaintiff received there between January and July 2005.  (AR 21, 215-239.)

22  An MRI scan of Plaintiff's cervical spine suggested that "a left paracentral focal disc protrusion of

23  mild degree" and indents and "causes only mild central spinal canal compromise."  (AR 239.)  The

24  MRI did not show any abnormalities.  (AR 239.)  The ALJ noted that Santa Rosa treatment records

25  show that Plaintiff experienced "minimal improvement" after participating in physical therapy.  (AR

26  215.)  The ALJ determined that the June 2005 MRI and the July 2005 discharge summary report did

27  not support Plaintiff's subjective symptom complaints.  *See Burch v. Barnhart*, 400 F.3d 676, 681

28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

20

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1    (9th Cir. 2005) (claimant not credible where MRI and x-rays show only mild degenerative disc

2    disease at L5-S1, and mild dextroscoliosis).

3           ALJ Wurdeman also cited a September 29, 2005 Nuerospinal Disorder evaluation, in which

4    Dr. Ames states that "her MRI scan reveals a left-sided C6-7 disc bulge, without any significant cord

5    narrowing or foraminal compromise." (AR 405.) Dr. Ames also reported that "she has normal

6    strength," and "some give away weakness secondary to pain in the right triceps only." (AR 405.)

7    Dr. Ames' assessed that "there is no structural explanation" on the MRI concerning Plaintiff's alleged

8    right-sided radiculopathy. (AR 405.) He recommended "conservative treatment with epidural

9    steroid injection in the 6-7 area." He did not find any surgical lesion. (AR 405.)

10          ALJ Wurdeman also considered the effectiveness of the medical treatment Plaintiff received.

11   In his decision, the ALJ referred to Dr. Lee's clinical report, which notes that Plaintiff "received

12   approximately two-and-a-half months of 60-70% relief of her neck and arm pain" following the

13   administration of a cervical epidural shot on October 26, 2005. (AR 381.) Dr. Lee's report indicated

14   that Plaintiff returned to the UCSF Pain Management Center on February 22, 2006 and May 24,

15   2006, and experienced similar relief and full motor strength in her upper extremities following the

16   administration of these epidural shots. (AR 381, 431, 438-39.) *See Odle v. Heckler*, 707 F.2d 439,

17   440 (9th Cir. 1983) (affirming a denial of benefits, noting that claimant's impairments were

18   responsive to medication). The ALJ also noted that Plaintiff had received minimal treatment for her

19   mental issues. (AR 23.) *See Lasich v. Astrue*, 2007 WL 3225460, at *1 (Oct. 30, 2007 9th Cir.)

20   (unpublished order) (claimant provided little evidence of significant mental findings demonstrating a

21   severe impairment and had not been regularly treated by a psychologist or psychiatrist or received

22   regular mental health counseling or therapy).

23          Regarding the consistency of Plaintiff's testimony and written statements, ALJ Wurdeman

24   examined Plaintiff's daily life activities and found that they weighed against her subjective

25   complaints of more limited activity. (AR 23); 20 C.F.R. § 416.929(c)(3)(I) (daily activities are

26   relevant to credibility determinations). The ALJ specifically considered Plaintiff's testimony,

27   including numbness in her hands, the ability to walk for only 10 to 15 minutes at a time due to neck

28

21

UNITED STATES DISTRICT COURT
For the Northern District of California

1   pain, and that she can only rotate her neck up to 45 degrees.  (AR 22-23.)  However, he found that

2   Plaintiff's complaints were "somewhat exaggerated," noting that Plaintiff took care of her own

3   personal needs, driving, attending church, cooking, doing light cleaning, shopping, watching movies

4   and reading, and that she occasionally socialized with others.  (AR 23.)  The ALJ also noted that

5   Plaintiff testified that she attended college at Santa Rosa Junior College for two or three semesters

6   and received a 4.0 grade point average.  (AR 22.); *see Rollins v. Massanari*, 261 F.3d 853, 857 (9th

7   Cir. 2001) (The claimant's allegations of "totally disabling pain w[ere] undermined by her own

8   testimony about her daily life activities").  Even if the Court were to find that Plaintiff's daily

9   activities could be viewed with an interpretation more favorable to her, the Court must uphold the

10  ALJ's interpretation.  *Burch*, 400 F.3d at 679 (citation omitted) (Although the evidence of

11  [claimant's] daily activities may also admit of an interpretation more favorable to [claimant], the

12  ALJ's interpretation was rational and we must uphold the ALJ's decision where the evidence is

13  susceptible to more than one rational interpretation).

14          ALJ Wurdeman also credited the third party statements of Mr. Foley to the extent they were

15  consistent with "claimant's statements and testimony indicating considerable activities of daily

16  living."  (AR 23.)  The ALJ found that Mr. Foley's testimony and written statements were largely

17  consistent with Plaintiff's.  (AR 23.)  Specifically, he considered Mr. Foley's statements that Plaintiff

18  participated in "considerable activities of daily living, including housework, shopping, driving, light

19  housework, watching television, and reading."  (AR 23, 144-153.)

20          Based on this analysis, the Court finds that the ALJ properly discredited Plaintiff's subjective

21  complaints, and provided specific, clear and convincing reasons for doing so.

22  **C.      Whether ALJ Wurdeman Properly Evaluated Plaintiff's RFC**

23          Plaintiff next contends that the ALJ failed to properly evaluate her RFC.  "In determining a

24  claimant's RFC, an ALJ must consider all relevant evidence in the record, including inter alia,

25  medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably

26  attributed to a medically determinable impairment.'"  *Robbins v. Social Security Sec. Admin*., 466

27  F.3d 880, 883 (9th Cir. 2006) (quoting SSR 96-8p, 1996 WL 374184, at *5).  "SSR 96-8p directs

28

that '[c]areful consideration' be given to any evidence about symptoms 'because subjective

descriptions may indicate more severe limitations or restrictions that can be shown by medical

evidence alone.'" *Robbins*, 466 F.3d at 883 (quoting SSR 96-8p, 1996 WL 374194, at *5).  "When

giving such consideration, if the record establishes the existence of a medically determinable

impairment that could reasonably give rise to the reported symptoms, an ALJ must make a finding

as to the credibility of the claimant's statements about the symptoms and their functional effect."

*Robbins*, 466 F.3d at 883 (internal citations omitted).

> In his decision, ALJ Wurdeman determined that Plaintiff retained the following RFC:

> I find claimant has an RFC for a range of work at the sedentary
> exertional level with limitation to 45 degree rotation of the head
> and preclusion from full flexion of the neck. In addition, claimant
> is precluded from work requiring remembering and carrying out
> detailed instructions and her ability to maintain concentration is in
> the low average range.

(AR 21.)  Plaintiff argues that ALJ Wurdeman: (1) failed to provide an evidentiary basis for the neck

movement limitations he listed; (2) failed to include a limitation for overhead reaching; and (3)

failed to properly account for her mental limitations.  The Court shall consider each argument in

turn.

>    1.    Neck Limitations

Plaintiff first argues that the ALJ failed to explain how he arrived at his findings regarding

the listed neck limitation.  Specifically, Plaintiff argues that the "preclusion from full flexion of the

neck" does not account for her "pain and/or limitation with sustaining neck positioning that was less

than full flexion," and that "the findings contained no recognition of Plaintiff's problems with neck

extension."  (Pl.'s Mot. at 5:10-13.).  In support of these arguments, Plaintiff cites to her hearing

testimony, in which she states that "[h]aving [her] head tilted down and having it tilted back" are

"very, very bad for [her]."  (AR 60.)  However, as discussed above, the Court finds that the ALJ

properly considered and rejected Plaintiff's subjective complaints.  Accordingly, it was unnecessary

for the ALJ to consider them in his evaluation of Plaintiff's RFC.  *Bayliss*, 427 F.3d at 1217 (citing

SSR 96-8p) ("Preparing a function-by-function analysis for medical conditions or impairments that

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1    the ALJ found neither credible nor supported by the record is unnecessary.")

2         Plaintiff provides no other evidence or legal basis for her argument.  Regardless, contrary to

3    Plaintiff's contentions, the Court finds that the ALJ properly explained how he arrived at the RFC.

4    ALJ Wurdeman looked to Santa Rosa Memorial Hospital progress and discharge reports, which

5    detail treatments Plaintiff received there between January and July 2005.  (AR 21, 215-239.)  The

6    ALJ noted that a MRI scan of Plaintiff's cervical spine showed only "mild degenerative changes."

7    (AR 21, 239.)  ALJ Wurdeman also noted that the Santa Rosa treatment records show that physical

8    therapy provided minimal improvement.  (AR 21.)

9         ALJ Wurdeman pointed to Dr. Ames' September 29, 2005 examination of Plaintiff for

10   complaints of neck and arm pain.  (AR 405-06.)  Dr. Ames noted that despite a disc bulge on the left

11   side, Plaintiff had no significant cord narrowing or foraminal compromise, and specifically stated

12   that there was "no structural explanation" for Plaintiff's allegations of right-sided radiculopathy.

13   (AR 21, 405.)  After completing a physical examination, Dr. Ames noted that Plaintiff had "normal

14   strength."  (AR 22, 405.)  Dr. Ames also noted that Electromyogram ("EMG") and nerve conduction

15   studies of Plaintiff's right arm were "normal" and showed "no evidence for either an ulnar

16   neuropathy or cervical radiculopathy to explain her symptoms."  (AR 453.)  Dr. Ames recommended

17   only conservative treatment with steroid injections.  (AR 22, 405.)  ALJ Wurdeman noted that

18   Plaintiff subsequently received epidural injections in October 26, 2005, February 22, 2006, and May

19   24, 2006, and that the injections provided 60 to 70 percent pain relief for approximately two and

20   one-half months after each treatment.  (AR 22, 381, 431, 452.)

21        Based on this analysis, the Court finds that the ALJ properly evaluated Plaintiff's RFC with

22   regard to her neck limitations.

23        2.    Overhead Reaching

24        Plaintiff next argues that the RFC should have included a limitation as to overhead reaching.

25   In support of her argument, she cites to a Disability Determination Services physician's opinion from

26

27

28

24

UNITED STATES DISTRICT COURT
For the Northern District of California

1    April 7, 2005[4], (AR 183-92), which limited Plaintiff's reaching in all directions, including overhead.

2    (AR 186.)  ALJ Wurdeman gave minimal weight to this opinion, finding the medical record "more

3    consistent with the ability to perform a range of sedentary work."  (AR 22.)

4           If the opinion of a treating or examining doctor is contradicted by another doctor, that

5    opinion can only be rejected for specific and legitimate reasons that are supported by substantial

6    evidence in the record.  *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995).  The ALJ is

7    responsible for resolving any such conflicts in medical testimony.  *Magallanes*, 881 F.2d at 750.

8           Here, the Court finds that the ALJ properly rejected the DDS opinion to the extent it was

9    inconsistent with the RFC finding.  As discussed above, Dr. Ames specifically opined in September

10   2005 - after the DDS opinion relied upon by Plaintiff - that Plaintiff had no significant cord

11   narrowing or foraminal compromise, she had normal muscle strength, and that there was "no

12   structural explanation" for her allegations of right-sided radiculopathy, particularly in light of the

13   MRI, EMG, and nerve conduction study results.  (AR 21, 405, 452-53.)  Since the DDS physician

14   did not have access to Dr. Ames' additional information, the ALJ reasonably discounted the DDS

15   physician's opinion.  Further, to the extent that conflicts exist between the opinions, the ALJ is

16   responsible for resolving any such conflicts.  *Magallanes*, 881 F.2d at 750.

17          Based on this analysis, the Court finds that the ALJ properly evaluated Plaintiff's RFC with

18   regard to overhead reaching.

19          3.     Mental Limitations

20          Finally, Plaintiff argues that ALJ Wurdeman did not properly account for her mental

21   limitations.  Specifically, Plaintiff argues that (1) the mental RFC states that Plaintiff's "ability to

22   maintain concentration is in the low average range," but this is not a functionally-specific term that

23   sufficiently describes her limitations; (2) the ALJ did not mention pain as a limitation or RFC factor,

24   so it remains unclear whether the assessed limitations were based on pain or just on depression; and

25   (3) the ALJ failed to consider other mental impairments, such as low mental functions, low IQ, and

26

27          [4] Although the ALJ's decision and Defendant's cross-motion both refer to a July 2005 opinion, they cite to the

28   opinion dated April 7, 2005.

25

1   borderline intellectual functioning, despite other sources finding that such limitations were present.

2   Based on the record as a whole, Plaintiff argues that ALJ Wurdeman should have found that

3   Plaintiff's mental RFC included limitation to simple repetitive tasks.

4          Although Plaintiff contends that the ALJ's mental RFC is inadequate, she fails to fully

5   explain why, and she provides no legal authority in support of her arguments.  Plaintiff's mere

6   disagreement is insufficient to establish any error.  For example, although Plaintiff argues that the

7   ALJ's use of the statement, "her ability to maintain concentration is in the low average range," is not

8   a functionally specific term that sufficiently describes her limitations, she states this in a one-

9   sentence paragraph with no explanation or legal authority.  (Pl.'s Mot. at 5:16-19.)  And, when

10  Defendant raised this fact in the cross motion, Plaintiff chose not to file any response.

11         Further, although Plaintiff contends that the ALJ did not account for the existence of other

12  mental functional limitations resulting from a low IQ, she does not acknowledge that the ALJ did

13  recognize her low average mental functioning by including a limitation on concentration based on

14  that condition.  (AR 22.)  In so doing, the ALJ specifically credited the opinion of Dr. Kastl.  It was

15  Dr. Kastl who articulated Plaintiff's functional limitations in concentration, persistence or pace as "in

16  the low average range."  (AR 22, 199.)  The ALJ also credited Dr. Kastl's findings to the extent he

17  diagnosed borderline intellectual functioning.  (AR 22, 199.)  It is unclear how Plaintiff argues that

18  the ALJ failed to account for borderline intellectual functioning when it is an explicit part of his

19  findings.  (AR 22, 199.)  This is also consistent with the DDS opinions that Plaintiff had borderline

20  intellectual functioning, (AR 199), which resulted in difficulty understanding, remembering, and

21  carrying out detailed instructions.  (AR 204-05.)

22         The Court also finds that the ALJ reasonably discounted the DDS opinions that imposed

23  additional mental limitations, such as to simple repetitive tasks, citing Plaintiff's ability to

24  successfully complete college classes with a 4.0 grade point average and the fact that she testified

25  that she had registered for more college classes.  (AR 22, 59-61.)  *See Macri v. Chater*, 93 F.2d 540,

26  544 (9th Cir. 1996) (ALJ permitted to make inferences "logically flowing from the evidence," and

27  correctly considered the claimant's enrollment in and completion of job training course in assessing

28

26

limitations). Thus, to the extent that Plaintiff may argue that ALJ Wurdeman failed to properly

reject the opinion of any examining doctors, the Court finds that the ALJ rejected any such opinions

for specific and legitimate reasons that are supported by substantial evidence in the record.

Based on this analysis, the Court finds that the ALJ properly evaluated Plaintiff's RFC. ALJ

Wurdeman supported his findings with substantial evidence in the medical record, and he properly

considered and rejected Plaintiff's subjective complaints. Accordingly, Plaintiff's argument is

without merit.

**D.      Whether the ALJ Properly Determined that Plaintiff Could Perform the Jobs
         Suggested by the Vocational Expert**

Finally, Plaintiff argues that the ALJ improperly credited the vocational expert's opinion

testimony. If the ALJ determines that a claimant is unable to perform past relevant work, he must

then show that there are other jobs existing in significant numbers in the national economy which

the claimant can perform consistent with the medically determinable impairments and symptoms,

functional limitations, age, education, work experience and skills. 20 C.F.R. § 404.1520(a)(4)(v); 20

C.F.R. § 404.1560(c). There are two ways to meet this burden: (1) the testimony of a vocational

expert, or (2) reference to the Medical-Vocational Guidelines. *Tackett v. Apfel*, 180 F.3d 1094, 1099

(9th Cir. 1999). Here, the ALJ called As to Plaintiff's ability to work as a mail clerk Vocational

Expert Gene Johnson to testify at the administrative hearing. (AR 62-66.)

"[T]he ALJ can call upon a vocational expert to testify as to: (1) what jobs the claimant,

given his or her residual functional capacity, would be able to do; and (2) the availability of such

jobs in the national economy." *Tackett*, 180 F.3d at 1101. "At the hearing, the ALJ poses

hypothetical questions to the vocational expert that 'set out all of the claimant's impairments' for the

vocational expert's consideration." *Id.* (quoting *Gamer v. Secretary of Health and Human Servs.*,

825 F.2d 1275, 1279 (9th Cir. 1987)). The vocational expert then testifies as to what kinds of jobs

the claimant still can perform and whether there is a sufficient number of those jobs available in the

claimant's region or in several other regions of the economy to support a finding of not disabled. *Id.*

(citation omitted.)

"The ALJ's depiction of the claimant's disability must be accurate, detailed, and supported by

27

UNITED STATES DISTRICT COURT
For the Northern District of California

1    the medical record." *Id.* (citation omitted.)  However, the ALJ need only include those limitations

2    supported by substantial evidence.  *Robbins*, 466 F.3d at 885.  If the ALJ does not include all

3    claimed impairments in his hypothetical, he must make specific findings explaining his rationale for

4    disbelieving any of the claimant's subjective complaints not included.  *Light v. Social Sec. Admin.*,

5    119 F.3d 789, 793 (9th Cir. 1997).  Consequently, "if the assumptions in the hypothetical are not

6    supported by the record, the opinion of the vocational expert that claimant has a residual working

7    capacity has no evidentiary value."  *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984).

8        At the June 8, 2006 hearing, ALJ Wurdeman posed the following hypothetical to vocational

9    expert Gene Johnson:

10           Let's assume we have an individual of Ms. Gallo's age, vocational
             and educational background. Let's put her in sedentary level of
11           exertion with the following additional limitations. Should not be
             required to rotate her neck more than 45 degrees form the center.
12           Should not be required to fully flex her neck, that's looking down.
             Should not be required to remember or carry out detailed
13           instructions. And she has what has been described as a[n] ability to
             concentrate in the low average range.

14   (AR 63.)  The vocational expert ("VE") offered two job prospects after considering the hypothetical:

15   (1) mail clerk, and (2) credit checker.  (AR 23, 64-65.)

16       As to Plaintiff's ability to work as a mail clerk, the VE testified that "going back to the

17   elements of your hypothetical, the work does not really require the need to have to rotate the neck

18   more than 45 degrees in either direction from center."  (AR 64.)  The VE stated that "[t]he work

19   involved in the job does not really require [Plaintiff] to have to fully flex the neck by looking down"

20   and was "not an overall requirement of the position."  (AR 64.)  The VE also testified that Plaintiff

21   would not be required to remember or carry out detailed instructions.  (AR 64.)  He stated that "[t]he

22   work is repetitive. It's the same function, repeat it time and time again.  And I think it would also

23   accommodate the ability to concentrate in the low average range."  (AR 64-65.)

24       As to Plaintiff's ability to work as a credit checker, the VE testified that after considering the

25   elements of the hypothetical, "it's desk-oriented work and there is not any extreme need to rotate the

26   neck to the 45 degrees from center."  (AR 64.)  The VE stated, "I don't think there's any need to

27   really be required to fully flex the neck by looking down."  (AR 64.)  The VE also testified that

28

1   "[t]he work is unskilled and the tasks are pretty routine to the extent that they do the same thing is

2   better done if you're checking applications or talking to people to gather information.  So I think the

3   ability to concentrate if it's in the low average range would be, the job would accommodate that

4   description."  (AR 64.)

5       Plaintiff raises three arguments regarding this testimny: (1) ALJ Wurdeman improperly

6   credited the vocational expert's findings that she could work as a  mail clerk; (2) ALJ Wurdeman

7   improperly credited the vocational expert's findings that she possessed the reasoning development

8   required to work as a credit checker; and (3) ALJ Wurdeman improperly found that both vocations

9   were supported by meaningful criterion for her concentration limitations.  The Court shall consider

10  each argument in turn.

11      1.    <u>Mail Clerk</u>

12      First, Plaintiff contends the VE's testimony was unreliable because the description of mail

13  clerk (or addresser as described in the Dictionary of Occupational Titles ("DOT")), did not meet the

14  ALJ's hypothetical.  Specifically, Plaintiff argues that the occupation "probably did not exist at all in

15  2007 as it did in 1977," and therefore the VE's testimony lacked reliability.  (Pl.'s Mot. at 7:1-7.)

16  Plaintiff argues that because the vocational description includes the use of a typewriter and manual

17  addressing rather than a computer and printer, "as a matter of very common knowledge recognizable

18  of judicial notice," the description of the vocation must be outdated.  (Pl.'s Mot. at 7:2-4.)  However,

19  Plaintiff fails to provide any evidentiary or legal basis for her argument.  Instead, the record contains

20  the vocational expert's testimony that 175,000 such jobs exist nationwide.  (AR 64) (citing DOT

21  code 209.587-010).  "An ALJ may take administrative notice of any reliable job information,

22  including information provided by a VE."  *Bayliss*, 427 F.3d at 1218.  Plaintiff, through counsel, did

23  not object to the VE's qualifications at the hearing, and her disagreement now, without citing to any

24  evidence which contradicts the VE's testimony, is unavailing.

25      In addition, Plaintiff contends that the title of mail clerk does not meet the hypothetical

26  because it is beyond Plaintiff's exertional limitations and, therefore, a significant number of jobs are

27  not available to her.  Specifically, Plaintiff contends that the position of mail clerk requires light

28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

exertion,[5] while the ALJ imposed an RFC which limited her to sedentary exertion.[6]  (AR 63-65.)

However, Plaintiff again fails to provide any legal or evidentiary basis to support her contentions.

Contrary to Plaintiff's argument, the ALJ properly relied on the VE's testimony.  ALJ Wurdeman

posed a hypothetical to the VE which specifically accounted for Plaintiff's sedentary exertional limit.

(AR 63-64.)  At the administrative hearing, the VE considered the limitations of Plaintiff's flexion

and rotation, and testified that Plaintiff could work as a mail clerk "except [for] postal clerks, DOT

code 209.587-010."[7]  (AR 64.)  Finally, the VE testified that 175,000 jobs existed in the U.S.

economy, with some 24,000 jobs in California for the position of mail clerk.  (AR 64.)  Therefore,

the Court finds that the ALJ properly determined that a significant number of jobs are available to

Plaintiff.  *See Martinez v. Heckler*, 807 F.2d 771, 775 (9th Cir.1986) (Whether there exists a

significant number of jobs "in the national economy," is a question of fact to be determined by the

administrative law judge).  Accordingly, the Court finds that the ALJ properly determined that the

vocation of mail clerk was not beyond Plaintiff's exertional limitations.

     2.    Credit Checker

     Next, Plaintiff contends that the job of credit checker is "at least somewhat detailed" and,

therefore, beyond her RFC.  However, once again, Plaintiff fails to offer any legal basis for her

---

[5] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity of inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

[6] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

[7] According to the DOT, the position of postal clerk requires light exertion.  *See* DOT code 209.587-010.

UNITED STATES DISTRICT COURT
For the Northern District of California

assertion.  In support of her argument, Plaintiff cites the DOT to support her contention that the

position of credit checker requires detailed instructions.  As Plaintiff points out, reasoning level

three jobs involve applying commonsense understanding to carry out instructions furnished in

written, oral, or diagrammatic form.  *See* DOT Code 205.367-014.  However, there is nothing in this

description which specifically requires remembering and carrying out "detailed" instructions.

Plaintiff also argues that even a reasoning level of two would require her to "[a]pply commonsense

understanding to carry out detailed but uninvolved written or oral instructions." *See* DOT Code

209.587-010.  However, credit checker is rated at level three, not two.

Furthermore, the VE specifically accounted for Plaintiff's ability to carry out details by

stating that the job was routine and could accommodate her.  (AR 64.)  Moreover, the vocational

expert testified that this job is "un-skilled" and has a "Specific Vocational Preparation ("SVP") of

two,"[8] which is unskilled work according to the DOT.  (AR 64.)  Unskilled work is work which

needs little to no specific vocational preparation or judgment to do simple duties, and can be learned

on the job in a short period of time.  *See* 20 C.F.R § 416.968(a); Social Security Ruling 83-10.

Plaintiff's reliance on a reasoning level of three is misplaced because she has not identified how this

reasoning level is inconsistent with an RFC precluding detailed instructions.  The vocational expert

specifically testified that the credit checker job involved "tasks [that] are pretty routine" and "would

accommodate the ability to not be required to carry out detailed instructions."  (AR 64.)  Here, the

vocational expert's recognized expertise is sufficient to establish reliable job data.  *See Bayliss*, 427

F.3d at 1217-18 (An ALJ may take administrative notice of any reliable job information, including

information provided by a VE).  Thus, the Court finds that the ALJ properly found that the position

of credit checker was not beyond Plaintiff's RFC.

   3. <u>Plaintiff's Mental Functioning and Low Average Range Concentration</u>

---

   [8]*See* Dictionary of Occupational Titles ("SVP" or specific vocational preparation is a number used to categorize jobs by the amount of time it takes to learn the job and correlates to skill level, and an SVP of 2 represent unskilled work, with a 30 day or less time period to learn the job.); Appendix C. Operations Manual System (POMS) Section DI 25001.001(B)(52) (occupations with an SVP rating 2 are considered unskilled).

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

Finally, Plaintiff argues that the hypothetical question failed to accurately depict her mental functioning. Plaintiff asserts that both occupations were not valid because they "presumably" require a "significant amount" of concentration, which exceeds the low average range posed in the hypothetical. (Pl.'s Mot. at 7-8:22-23, 1-4.) However, the Court finds that ALJ Wurdeman properly included "meaningful criterion" for Plaintiff's mental functioning and limitations in the hypothetical. *See Bayliss*, 427 F.3d at 1217 (ALJ properly relied on VE's testimony where the ALJ's posed hypothetical to the VE contained all of the limitations that he found credible and supported by substantial evidence in the record.); *see also Robbins v. Social Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006) (In hypotheticals posed to a vocational expert, the ALJ must only include those limitations supported by substantial evidence).

ALJ Wurdeman accounted for Plaintiff's RFC by precluding her "from work requiring remembering and carrying out detailed instructions and her ability to maintain concentration is in the low average range." (AR 24.) As discussed in Section B above, the ALJ cited to Dr. Kastl's June 2005 opinion that "claimant's concentration persistence and pace would fall in the 'low-average range.'" (AR 22, 199.) The ALJ also noted that this is consistent with DDS's opinion that Plaintiff had borderline intellectual functioning, (AR 22, 199), which resulted in difficulty understanding, remembering, and carrying out detailed instructions. (AR 22, 204-05.) Based on this analysis, the Court finds that the ALJ's posed hypothetical properly accounted for Plaintiff's mental functioning and low-average range concentration.

Based on this analysis, he Court finds that the ALJ correctly determined that Plaintiff can perform the tasks required of a mail clerk and credit checker, as determined by the VE. Accordingly, Plaintiff's argument is without merit.

### V.  CONCLUSION

Based on the foregoing analysis, the Court hereby DENIES Plaintiff's motion for summary judgment and GRANTS Defendant's cross-motion for summary judgment.

**IT IS SO ORDERED.**

32

Dated: February 12, 2010

_____
Maria-Elena James
Chief United States Magistrate Judge